Emily Johnson Henn (Bar No. 269482)
Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800
Email: ehenn@cov.com
Email: kcahoy@cov.com

Isaac D. Chaput (Bar No. 326923)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email:  ichaput@cov.com

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email:  asimonsen@cov.com

*Attorneys for Defendant Microsoft Corporation*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| A.T., et al., individually and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>OPENAI LP, et al.,<br><br>　　　Defendants. | Civil Case No.: 3:23-cv-4557-VC<br><br>**MICROSOFT CORPORATION'S MOTION TO COMPEL ARBITRATION AND STAY CLAIMS**<br><br>Date: April 11, 2024<br>Time: 10:00 a.m.<br>Place: Courtroom 4<br><br>Judge: The Honorable Vince Chhabria |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................................... 2

    A. The Microsoft Services Agreement ......................................................................... 2

    B. The MSA's Arbitration Agreement .......................................................................... 3

    C. Microsoft Privacy Statement .................................................................................... 4

    D. MSA Updates ........................................................................................................... 4

    E. Arbitration Plaintiffs Accepted the MSA and Its Arbitration Agreement and Class Action Waiver ........................................................................................................... 5

    F. The Arbitration Plaintiffs' Claims ............................................................................ 7

III. LEGAL STANDARD ........................................................................................................... 7

IV. ARGUMENT ........................................................................................................................ 8

    A. Each Arbitration Plaintiff Agreed to Arbitrate Disputes with Microsoft. ................ 8

        1. The Arbitration Plaintiffs Entered Valid Arbitration Agreements. ....................... 8

        2. Each Arbitration Plaintiff Accepted Updated Versions of the MSA. .................. 11

    B. Plaintiffs' Claims Are Within the Scope of the Arbitration Agreement ................ 12

    C. The Court Should Stay the Arbitration Plaintiffs' Claims Pending Arbitration. ... 14

V. CONCLUSION ................................................................................................................... 14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Exp. Co.* v. *Italian Colors Rest.*,
    570 U.S. 228 (2013) ............................................................................................................. 7

*Amirhamzeh v. Wells Fargo Bank, N.A.*,
    2014 WL 12610227 (N.D. Cal Oct. 31, 2014) ................................................................... 13

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal. 4th 83 (2000) ......................................................................................................... 14

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986) ........................................................................................................... 12

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ........................................................................................... 9, 10

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ............................................................................................. 7

*Day v. Microsoft Corp.*,
    2014 WL 243159 (W.D. Wash. Jan 22, 2014) ........................................................... 2, 8, 10

*Diaz v. Intuit, Inc.*,
    2017 WL 4355075 (N.D. Cal. Sept. 29, 2017) .................................................................. 14

*Dohrmann v. Intuit, Inc.*,
    823 F. App'x 482 (9th Cir. 2020) ................................................................................ 10, 11

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ............................................................................................................. 8

*In re Facebook Biometric Info. Priv. Litig.*,
    185 F. Supp. 3d 1155 (N.D. Cal. 2016) ............................................................................. 12

*Graf v. Match.com, LLC*,
    2015 WL 4263957 (C.D. Cal. July 10, 2015) .................................................................... 11

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
    139 S. Ct. 524 (2019) ........................................................................................................... 7

*Hovis v. Homeaglow, Inc.*,
    2023 WL 5003583 (S.D. Cal. Aug. 4, 2023) ..................................................................... 14

*J.A. through Allen v. Microsoft Corp.*,
    2021 WL 1723454 (W.D. Wash. Apr. 2, 2021) ......................................................... 2, 8, 10

*In re Juul Labs, Inc., Antitrust Litig.*,
   555 F. Supp. 3d 932 (N.D. Cal. 2021) ..................................................................................14

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019) ..................................................................................................8, 12

*Lee v. Ticketmaster L.L.C.*,
   817 F. App'x 393 (9th Cir. 2020) .................................................................................10, 11

*Long v. Provide Com., Inc.*,
   245 Cal. App. 4th 855 (2016) ..............................................................................................9

*Maher v. Microsoft Corp.*,
   2018 WL 1535043 (N.D. Ill. Mar. 29, 2018) ............................................................2, 8, 10

*Mendoza v. Microsoft Inc.*,
   2014 WL 4540225 (W.D. Wash. Sept. 11, 2014) .....................................................2, 8, 10

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ................................................................................................11

*Nevarez v. Forty Niners Football Co., LLC*,
   2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) ..................................................................11

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .........................................................................................8, 9

*Oberstein v. Live Nation Ent., Inc.*,
   60 F.4th 505 (9th Cir. 2023) .........................................................................................9, 10

*Romanov v. Microsoft Corp.*,
   2021 WL 3486938 (D.N.J. Aug. 9, 2021) ................................................................2, 8, 10

*Sadlock v. Walt Disney Co.*,
   2023 WL 4869245 (N.D. Cal. July 31, 2023) ...................................................................12

*Selden v. Airbnb, Inc.*,
   2016 WL 6476934 (D.D.C. Nov. 1, 2016) .........................................................................9

*In re Uber Techs., Inc.*,
   2019 WL 6317770 (C.D. Cal. Aug. 19, 2019) ..................................................................12

*Walsh v. Microsoft Corp.*,
   2014 WL 4168479 (W.D. Wash. Aug. 20, 2014) ......................................................2, 8, 10

*West v. Uber Techs.*,
   2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ....................................................................12

**Statutes**

9 U.S.C. § 2 ............................................................................................................................. 7

9 U.S.C. § 3 ........................................................................................................................... 14

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY

PLEASE TAKE NOTICE that, on April 11, 2024, Defendant Microsoft Corporation will and hereby does move for an order compelling Plaintiffs Nicholas Guilak, Paul Martin, and Jair Paz to individually arbitrate their claims under 9 U.S.C. §§ 1–4 and staying their claims under 9 U.S.C. § 3 pending the outcome of their arbitrations. This Motion is based on this Notice, the accompanying Memorandum, the Declaration of Suzanne Fogarty and attached exhibits, the First Amended Complaint, and any other matters presented at the time of the hearing.

I.   INTRODUCTION

Three named Plaintiffs—Nicholas Guilak, Paul Martin, and Jair Paz ("Arbitration Plaintiffs")—allege they are users of Microsoft's Bing Chat service (now known as Microsoft Copilot).[1] Plaintiffs allege that Microsoft "integrated" OpenAI's generative artificial intelligence technology (i.e., the large language models powering ChatGPT) into Microsoft Copilot and that Microsoft subsequently "intercepted" their private data as they used Microsoft Copilot.

All of Plaintiffs' claims are fundamentally flawed.[2] But the Arbitration Plaintiffs' claims in particular belong in individual arbitration, not in court under Rule 23. When they signed up for Microsoft accounts, the Arbitration Plaintiffs agreed to the Microsoft Services Agreement ("MSA"), including its arbitration agreement, through an easy-to-understand and enforceable method of notice and assent. The MSA applies to Bing generally and to Microsoft Copilot specifically, and it explicitly incorporates the Microsoft Privacy Statement, which explains what data Microsoft collects and uses, and gives customers such as the Arbitration Plaintiffs choices about their data. The Arbitration Plaintiffs' claims thus fall squarely within the scope of the MSA's arbitration agreement, under which the Arbitration Plaintiffs also

---

[1] While five other Plaintiffs allege using other Microsoft services, only Plaintiffs Guilak, Martin, and Paz allege using Microsoft services *enabled with generative AI*—the subject of their claims. Nor does Microsoft have adequate information about the other Plaintiffs for it to confirm whether an arbitration agreement applies to the other Plaintiffs' claims. Microsoft does not waive, and expressly reserves, its right to compel other Plaintiffs to arbitration should the record show their claims are subject to a Microsoft arbitration agreement.

[2] Microsoft concurrently files a Motion to Dismiss First Amended Complaint asking this Court to dismiss with prejudice the claims against Microsoft in Plaintiff's First Amended Complaint (Dkt. 45) under Rule 12(b)(6). Should the Court grant this Motion, it need not reach Microsoft's Motion to Dismiss as to the Arbitration Plaintiffs.

agreed they would not bring a class action against Microsoft in court. Courts across the country have repeatedly enforced Microsoft's arbitration agreements and class action waivers, and have done so under long-settled Supreme Court and Federal Arbitration Act case law. *See, e.g.*, *J.A. through Allen v. Microsoft Corp.*, 2021 WL 1723454, at *4 (W.D. Wash. Apr. 2, 2021); *Romanov v. Microsoft Corp.*, 2021 WL 3486938, at *4 (D.N.J. Aug. 9, 2021); *Maher v. Microsoft Corp.*, 2018 WL 1535043, at *1 (N.D. Ill. Mar. 29, 2018); *Mendoza v. Microsoft Inc.*, 2014 WL 4540225, at *1 (W.D. Wash. Sept. 11, 2014); *Walsh v. Microsoft Corp.*, 2014 WL 4168479, at *1 (W.D. Wash. Aug. 20, 2014); *Day v. Microsoft Corp.*, 2014 WL 243159, at *1 (W.D. Wash. Jan 22, 2014). As with these courts, this Court should enforce the MSA, compel the Arbitration Plaintiffs' claims to individual arbitrations, and stay all of their claims pending the outcome of those arbitrations.

## II.     FACTUAL BACKGROUND

### A.     The Microsoft Services Agreement

To access Microsoft's consumer online services, one must first create a Microsoft services account. To create such an account when the Arbitration Plaintiffs did, the Arbitration Plaintiffs had to enter an email address on the account creation page, create a password, and then press a button marked "I Agree" to proceed. Fogarty Decl. ¶ 3. Above the "I Agree" button, the screen told the Arbitration Plaintiffs that "Choosing **I Agree** means that you agree to the Microsoft Services Agreement" and provided a prominent hyperlink to the MSA immediately above the "I Agree" button in blue font. *Id.* The Arbitration Plaintiffs therefore had the opportunity to review the MSA in its entirety, including its arbitration agreement, before deciding whether to click the "I Agree" button and accept the MSA. Ex. 1 (example of sign-up screen).[3] The Arbitration Plaintiffs could not have created their Microsoft services accounts without going through this process and clicking on "I Agree" after receiving notice of and an opportunity to review the MSA. Since 2012, the terms of the MSA have included an arbitration agreement. Fogarty Decl. ¶ 2. The MSA listed the "Covered Services" to which it applies in an easy to find section titled "Covered Services." Microsoft periodically updates the MSA, sends users notices of those updates, and gives them the

---

[3] Currently, a user clicks "Next" instead of "I Agree" to manifest assent and proceed with account creation, and Microsoft tells prospective users that "Choosing **Next** means that you agree to the Microsoft Services Agreement." Fogarty Decl. ¶ 3. The language change has no legal significance; the process otherwise remains the same.

opportunity to review the updated terms before continuing to use Microsoft's services, as discussed more fully below. *Infra* Part II.D. The Covered Services included Bing.com and, once released in 2023, Microsoft Copilot. Fogarty Decl. ¶ 4; Exs. 8 (2012), 2 (2014), 10 (2016), 9 (2022), 5 (2023), 6 (current). Before Bing Chat (also known as Bing Conversational Experiences) was rebranded as Microsoft Copilot, Bing Conversational Experiences was separately identified as a Covered Service in the MSA. Ex. 5.

### B. The MSA's Arbitration Agreement

The MSA includes a binding individual arbitration agreement and class action waiver. The first sentence of the MSA contains a conspicuous notice in capitalized and bold letters instructing readers to review the arbitration agreement and class action waiver located in Section 15 of the MSA. Directly below the "Microsoft Services Agreement" title, the following appears: "**IF YOU LIVE IN (OR YOUR PRINCIPAL PLACE OF BUSINESS IS IN) THE UNITED STATES, PLEASE READ THE BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER IN SECTION 15. IT AFFECTS HOW DISPUTES ARE RESOLVED.**" Ex. 6. A materially identical notice appeared in each version of the MSA since the arbitration agreement was added in 2012 (Ex. 8); the same language appeared in the 2022 and 2023 MSA that the Arbitration Plaintiffs accepted when they received notice of and an opportunity to review those updated MSAs (Exs. 5, 6, 9).

Under Section 15 of the MSA, Microsoft requires users having disputes with Microsoft to engage in informal dispute resolution efforts for a period of 60 days. Ex. 6 § 15. If the dispute is not resolved within the 60-day window, the user and Microsoft

> **agree to binding individual arbitration before the American Arbitration Association ("AAA") under the Federal Arbitration Act ("FAA"), and not to sue in court in front of a judge or jury**. Instead, a neutral arbitrator will decide and the arbitrator's decision will be final except for a limited right of review under the FAA. **Class action lawsuits, class-wide arbitrations, private attorney-general actions, requests for public injunctions, and any other proceeding or request for relief where someone acts in a representative capacity aren't allowed. Nor is combining individual proceedings without the consent of all parties.**

*Id.* § 15(a) (emphasis in original).

A "dispute" under the MSA is defined to be "as broad as it can be," so as to include

> any claim or controversy between you and us concerning the Services, the software related to the Services, the Services' or software's price, your Microsoft account, marketing, communications, your purchase transaction,

> billing, or these Terms, under any legal theory including contract, warranty, tort, statute, or regulation, except disputes relating to the enforcement or validity of your, your licensors', our, or our licensors' intellectual property rights.

*Id.* § 15(a) (emphasis omitted).

### C. Microsoft Privacy Statement

The first provision of the MSA addresses privacy and expressly states that Microsoft may collect, use, and disclose users' data in accordance with the Microsoft Privacy Statement, which is incorporated by reference in the MSA and readily available to review through a prominent blue hyperlink in the MSA. Section 1 of the version of the MSA currently in effect (which the Arbitration Plaintiffs accepted) provides as follows:

> Your privacy is important to us. Please read the Microsoft Privacy Statement (the "**Privacy Statement**") as it describes the types of data we collect from you and your devices ("**Data**"), how we use your Data, and the legal bases we have to process your Data. The Privacy Statement also describes how Microsoft uses your content . . . . Where processing is based on consent and to the extent permitted by law, ***by agreeing to these Terms, you consent to Microsoft's collection, use and disclosure of Your Content and Data as described in the Privacy Statement***.

Ex. 6 § 1 (second emphasis added). The Microsoft Privacy Statement explains the "personal data Microsoft processes, how Microsoft processes it, and for what purposes." *Id.* It includes numerous provisions governing, among other things, use and sharing of user data and choices users may make about their data.

### D. MSA Updates

Users agree to be bound by updates to the MSA. Section 7 of the current version of the MSA provides that Microsoft

> may change these Terms at any time, and we'll tell you when we do. Using the Services after the changes become effective means you agree to the new terms. If you don't agree to the new terms, you must stop using the Services, close your Microsoft account and, if you are a parent or guardian, help your minor child close his or her Microsoft account.

Ex. 6 § 7. Earlier versions of the MSA, including earlier versions accepted by the Arbitration Plaintiffs, had materially identical language. *See* Exs. 8 § 1.4; 2 § 1.3; 10, 9, 5, 6 § 7. When Microsoft updates the MSA, it notifies existing account holders through email notifications and pop-up notices (referred to as

"interrupt" notices). Fogarty Decl. ¶ 4. Interrupt notices appear when the user accesses a Microsoft online customer service following an MSA update; the interrupt notices require that the user click "Next" to acknowledge the notice before the user can proceed to use the service. *Id.* Email notifications that are sent to all Microsoft services account holders before the updated MSA goes into effect provide a hyperlink—bolded and in blue text—to the updated MSA and a second hyperlink to an FAQ page summarizing any changes to the MSA. Exs. 7 (2012), 11 (2022), 3 (2023). In this way, Microsoft gives users the opportunity to review the updated MSA, including any updates to the arbitration agreement, before deciding whether to click "Next." The email notice reminds the user that they agree to the new terms by "continu[ing] use of the products and services" after the effective date of the update. The notice also reminds the user to discontinue use and close their Microsoft services account if they do not assent to the changed terms. Exs. 7 (2012), 11 (2022), 3 (2023). When Microsoft first added an arbitration agreement to the MSA in 2012, its email to users specifically noted that agreement. Ex. 7. When Microsoft added Bing Conversational Experiences to the "Covered Services," that update was also part of the September 2023 MSA update that followed this same prior notice and opportunity to review process. Exs. 3, 5.

> E. **Arbitration Plaintiffs Accepted the MSA and Its Arbitration Agreement and Class Action Waiver**

Microsoft business records confirm that each Arbitration Plaintiff consented to the MSA and its arbitration agreement and class action waiver. Each Arbitration Plaintiff alleges using various Microsoft consumer online services, including Bing Chat, now Microsoft Copilot. *See* First Amended Complaint ("FAC") ¶¶ 35 (Guilak), 46 (Martin), 77 (Paz). The MSA governs the Arbitration Plaintiffs' Microsoft services accounts and their use of the Covered Services, including Microsoft Copilot. Exs. 5 ("Bing Conversational Experiences" included in Covered Services), 6 ("Microsoft Copilot" included in Covered Services).

After commencing this litigation, counsel for the Arbitration Plaintiffs provided to Microsoft the email addresses associated with these Plaintiffs' Microsoft services accounts. Microsoft then confirmed by searching its business records that each Arbitration Plaintiff accepted the MSA by creating a Microsoft services account registered with those emails and using those services. *See* Fogarty Decl. ¶¶ 7–9.

Specifically, each Arbitration Plaintiff registered their Microsoft services account and initially agreed to Microsoft's terms at the dates and times listed below:

| Plaintiff | Time/Date of Account Registration |
|---|---|
| Paul Martin | May 23, 2015 at 11:50:12 PM UTC |
| Nicholas Guilak | September 11, 2001 at 8:13:10 AM UTC[4] |
| | January 31, 2017 at 1:51:20 AM UTC |
| Jair Paz | August 10, 2012 at 5:11:15 PM UTC[5] |
| | January 22, 2017 at 11:21:10 PM UTC |

Fogarty Decl. ¶¶ 7–9.

In 2023, Microsoft sent each of the Arbitration Plaintiffs an email notification of updates to the MSA, which took effect on September 30, 2023.  *See* Fogarty Decl. ¶¶ 7–9; Ex. 3 (2023 email notification regarding MSA update).  Microsoft's business records also show that Martin clicked on an interrupt notice acknowledging the September 30, 2023, MSA update, and Guilak and Paz clicked on interrupt notices acknowledging the August 15, 2022, MSA update.  Fogarty Decl. ¶¶ 7–9.  Each Arbitration Plaintiff clicked those notices and agreed to the updated MSAs at the dates and times listed below after having an opportunity to review the updated MSAs:

| Plaintiff | Time/Date of Updated MSA Acknowledgement |
|---|---|
| Paul Martin | October 12, 2023 at 12:43:26 PM UTC |
| Nicholas Guilak | September 25, 2022 at 3:42:16 PM UTC |
| | N/A |

---

[4] Guilak assented to the MSA, and its arbitration agreement, by continuing to use this account after the MSA was updated in 2012.  Fogarty Decl. ¶ 8.

[5] Paz assented to the MSA, and its arbitration agreement, by continuing to use this account after the MSA was updated later in 2012.  Fogarty Decl. ¶ 9.

| | |
|---|---|
| Jair Paz | September 24, 2022 at 5:33:13 AM UTC |
| | September 25, 2022 at 5:15:21 AM UTC |

Fogarty Decl. ¶¶ 7–9. All of the Arbitration Plaintiffs' accounts remain active in Microsoft's system. *Id.*

### F. The Arbitration Plaintiffs' Claims

As explained in the concurrently filed Motions to Dismiss, Plaintiffs' allegations against Microsoft are opaque to the point of failing to state a plausible claim. It appears, however, that Plaintiffs allege Microsoft is liable for unspecified harms to Plaintiffs' privacy and property rights due to OpenAI purportedly training its generative AI models on data from Microsoft's services that incorporate generative AI technology, i.e., Microsoft Copilot. *See* FAC ¶¶ 35 (alleging Guilak "uses Bing Chat to interact with an AI-powered chat for quick information research" and not identifying other AI features he has used in Microsoft services), 46 (same for Martin), 77 (same for Paz); *see also id.* ¶¶ 453–67 (allegations of training OpenAI technology on data from plug-ins), 580 (alleging that Microsoft integrates OpenAI plug-ins into its technology). But having agreed to individually arbitrate any disputes with Microsoft arising from their use of these services, the Arbitration Plaintiffs may not pursue their claims in this Court as a class action.

### III. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "reflects the overarching principle that arbitration is a matter of contract" and "courts must rigorously enforce arbitration agreements according to their terms." *Am. Exp. Co.* v. *Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (cleaned up); *see also Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("Under the Act, arbitration is a matter of contract, and courts *must* enforce arbitration contracts according to their terms." (emphasis added)). As a result, courts decide only two "gateway" issues on a motion to compel arbitration: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). In deciding these issues, courts "apply ordinary state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175

(9th Cir. 2014).  The FAA not only "require[s] courts to respect and enforce agreements to arbitrate; it also specifically direct[s] them to respect and enforce the parties' chosen arbitration procedures." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) ("Consent is essential under the FAA because arbitrators wield only the authority they are given. . . . Whatever they settle on, the task for courts and arbitrators at bottom remains the same: to give effect to the intent of the parties." (cleaned up)).

IV. **ARGUMENT**

Each Arbitration Plaintiff created an account to use Microsoft's online consumer services.  When they did so—as Microsoft shows in the evidence submitted with this Motion—they agreed to the MSA, including its arbitration agreement and class action waiver, after having had notice of and an opportunity to review those terms.  Since then, each Arbitration Plaintiff has also agreed to the current version of the MSA that includes the current binding arbitration agreement, again after receiving notice of and an opportunity to review the terms, including the fact the MSA covers Bing Conversational Experiences (now called Microsoft Copilot).  Courts, including this Court, routinely enforce internet agreements that are materially identical to this one, and have repeatedly enforced Microsoft's online arbitration agreements specifically.  *See, e.g.*, *J.A.*, 2021 WL 1723454, at *4; *Romanov*, 2021 WL 3486938, at *4; *Maher*, 2018 WL 1535043, at *1; *Mendoza* 2014 WL 4540225, at *1; *Walsh*, 2014 WL 4168479, at *1; *Day*, 2014 WL 243159, at *1.  The broad arbitration agreement in the MSA governs the Arbitration Plaintiffs' claims, and the Court should compel them to individually arbitrate their claims and stay those claims pending their arbitrations.

    A. **Each Arbitration Plaintiff Agreed to Arbitrate Disputes with Microsoft.**

        1. <u>The Arbitration Plaintiffs Entered Valid Arbitration Agreements.</u>

Each Arbitration Plaintiff agreed to the MSA when creating their respective Microsoft services accounts using the process described above, enabling them to use the services of which they now complain.[6]  *See supra* Parts II.A, II.E.  Consequently, each Arbitration Plaintiff formed a valid and

---

[6] Plaintiffs Guilak and Paz each have one account that was opened before the MSA included an arbitration agreement, and one account that was opened after that date.  Even as to the earlier accounts, they have assented to the arbitration agreement in subsequent MSA updates.  *See infra* Part IV.A.2.

enforceable agreement to arbitrate disputes with Microsoft under California law. *See Nguyen*, 763 F.3d at 1175 (state contract law applies to arbitration agreement formation).[7]

Under California law, "mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 862 (2016). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen*, 763 F.3d at 1175 (cleaned up). When evaluating online agreements like the MSA, courts find enforceable agreements where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (courts examine whether "the consumer has received notice of the terms being offered and, in the words of the Restatement, 'knows or has reason to know that the other party may infer from his conduct that he assents' to those terms" (quoting Restatement (2d) of Contracts) § 19(2))). Consequently, courts regularly enforce "sign-in wrap" agreements—those "in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service." *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) (compelling arbitration). Courts look to whether the sign-in wrap agreement provides reasonably conspicuous notice and requires an unambiguous manifestation of assent. *See, e.g.*, *Oberstein*, 60 F.4th at 516 ("The language 'By continuing past this page and clicking [the button], you agree to our Terms of Use' clearly denotes that continued use will act as a manifestation of the user's intent to be bound." (internal quotation marks and citations omitted)); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020); *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394–95 (9th Cir. 2020).

The MSA fully satisfies the requirements for an enforceable sign-in wrap agreement. The Arbitration Plaintiffs could not create their Microsoft services accounts without first clicking the action

---

[7] California law applies to the question of contract formation because each Arbitration Plaintiff alleges they are a California resident. The "laws of the state where [the user] live[s]" governs claims under the MSA. *See* Ex. 6, ¶ 11.

("I Agree") button. Fogarty Decl. ¶ 3; Ex. 1. Immediately above the action button, explicit and conspicuous text made clear that "Choosing I Agree means that you agree to the Microsoft Services Agreement." Fogarty Decl. ¶ 3; Ex. 1. The words "Microsoft Services Agreement" were hyperlinked in blue text so that the MSA could be readily accessed and reviewed, giving the Arbitration Plaintiffs notice of the terms and an opportunity to review them before clicking "I Agree." Ex. 1. Microsoft also made the arbitration agreement in the MSA easy to find, providing a conspicuous heading in all capital and bold letters stating that the MSA contains an arbitration agreement. *See, e.g.*, Exs. 2, 9. That provides reasonably conspicuous notice because "the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856. The reference to the MSA was positioned directly above the "I Agree" button in blue font denoting a hyperlink. *See Oberstein*, 60 F.4th at 516 (finding that "bright blue font" of hyperlink "ma[de] its presence readily apparent"). By clicking on that button, the Arbitration Plaintiffs manifested their acceptance of the MSA. Indeed, courts have found acceptance when plaintiffs click an action button after "explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Id.* at 857.

Courts have held that *these precise notices* created valid arbitration agreements under basic contract-law principles. *See, e.g.*, *J.A.*, 2021 WL 1723454, at *4, ECF No. 47 (granting motion to compel arbitration based on notice with "Next") (image available at Case No. 20-cv-0640, ECF No. 37, ex. K); *Day*, 2014 WL 243159, at *1 (granting motion to compel arbitration based on notice with "I Agree").[8] In fact, courts have repeatedly enforced Microsoft's online arbitration agreements. *See Romanov*, 2021 WL 3486938, at *4; *Maher*, 2018 WL 1535043, at *1; *Mendoza*, 2014 WL 4540225, at *1; *Walsh*, 2014 WL 4168479, at *1. The same result should follow here.

Courts in California and across the country have held that notices with similar material features constitute valid agreements. In *Lee v. Ticketmaster, L.L.C.*, for example, this Court held that a sign-in wrap agreement similar to the one at issue here created a valid agreement. 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1, 2019) (Chhabria, J.), *aff'd*, 817 F. App'x at 393. Even though the user in *Lee* was "not

---

[8] The *J.A.* court referred to the agreement as "clickwrap," but since then, the terminology around the different types of internet agreements has been further refined. In any case, the content of the agreement matters, not the label.

required to check a separate box to indicate his assent," the Court explained the user had sufficient notice because "Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that 'continuing past this page' (i.e., placing an order) would indicate assent to the terms." *Id.*; *see also Lee v. Ticketmaster, L.L.C*, Case No. 18-cv-05987, ECF No. 25, at 5 (including image of sign-in wrap purchase flow). The Microsoft sign-in process at issue here provides notice at least equivalent to the *Ticketmaster* notice.

*Ticketmaster* is consistent with numerous decisions finding sign-in wrap agreements like the one here sufficient to create a binding agreement. In *Dohrmann*, for instance, the Ninth Circuit held that the following agreement was binding: "a user accessing a TurboTax account, . . . was required to click a 'Sign In' button, directly under which the following language appeared: 'By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement,'" with blue hyperlinks to the relevant terms. *Dohrmann*, 823 F. App'x at 484. And other courts have enforced sign-in wrap agreements similar to or even less conspicuous and clear than this one. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79–80 (2d Cir. 2017) (under California law, valid agreement formed based on sign-in wrap in which user accepted terms available via hyperlink in order to create an account); *Nevarez v. Forty Niners Football Co., LLC*, 2017 WL 3492110, at *8 (N.D. Cal. Aug. 15, 2017) (valid agreement formed where terms were "visible via a hyperlink" below the buttons "Accept and Continue" and "Sign In"); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (valid agreement formed from sign-in wrap where "users . . . were required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button . . . which were always hyperlinked and available for review").

2. Each Arbitration Plaintiff Accepted Updated Versions of the MSA.

The Arbitration Plaintiffs accepted updated versions of the MSA, including any updates to the arbitration agreement, by acknowledging interrupt notices to continue using their accounts. *Supra* Part II.E. Those interrupt notices, like the initial account registration process, created enforceable contracts by requiring the Arbitration Plaintiffs to click a "Next" button adjacent to an explanation that Microsoft has updated the terms of the MSA and including a hyperlink to the updated MSA in a contrasting color. Ex. 4.

The Arbitration Plaintiffs also received email notice of the updated MSA and affirmatively chose not to close their Microsoft services accounts, as Microsoft required them to do if they chose not to accept the updated terms.  *See* Fogarty Decl. ¶¶ 7–9; Exs. 7 and 8 (2012); 11 and 9 (2022); 3 and 5 (2023).  The Arbitration Plaintiffs' receipt of email notice followed by continued use manifested their valid assent to be bound.  *See Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *12 (N.D. Cal. July 31, 2023) ("The Court agrees with [other] courts that emails followed by continued use is sufficient to establish assent."); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (email notice to users of updated terms "in combination with a user's continued use is enough for notice and assent"); *In re Uber Techs., Inc.*, 2019 WL 6317770, *4, (C.D. Cal. Aug. 19, 2019) (plaintiffs assented to new terms by continued use after receiving email notice of updated terms); *West v. Uber Techs.*, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) (same).

    **B.**  **Plaintiffs' Claims Are Within the Scope of the Arbitration Agreement.**

The Supreme Court has held that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (alterations omitted); *see also Lamps Plus*, 139 S. Ct. 1407, 1415 ("The FAA requires courts to enforce arbitration agreements according to their terms." (cleaned up)).  When an agreement is broad and does not have "any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  *AT&T*, 475 U.S. at 650.

The MSA's arbitration agreement plainly encompasses this dispute.  The agreement to arbitrate "is as broad as it can be."  Ex. 6 § 15(a).  The definition of "dispute" encompasses "any claim or controversy between you and us concerning the Services, the software related to the Services, the Services' or software's price, your Microsoft account, marketing, communications, your purchase transaction, billing, or these Terms, under any legal theory including contract, warranty, tort, statute, or regulation."  *Id.*  The Arbitration Plaintiffs' claims against Microsoft at least concern the Services—which include the Bing Chat service each alleges having used—and the Arbitration Plaintiffs' Microsoft services accounts.  *See* FAC ¶¶ 35, 46, 57, 66, 77, 103, 117, 124.  It does not matter to this analysis that some of Plaintiffs'

claims appear related to allegations that OpenAI used data obtained from Microsoft to train OpenAI's technology. The claims against Microsoft "concern" Microsoft Copilot (previously known as Bing Conversational Experiences and part of Bing.com) because the Arbitration Plaintiffs allege that OpenAI's technology was trained in part using data from that service and claim to have been harmed by that training. *See, e.g.*, FAC ¶¶ 453–67 (allegations of training OpenAI technology on data from plug-ins), 580 (alleging that Microsoft integrates OpenAI plug-ins into its technology).[9]

Further, this dispute focuses on Microsoft's alleged collection and handling of the Arbitration Plaintiffs' data, a matter squarely within the MSA. The MSA provides that the Arbitration Plaintiffs "consent to Microsoft's collection, use and disclosure of [their] Content and Data as described in the [Microsoft] Privacy Statement," and the Privacy Statement explains how Microsoft collects data from users and authorizes Microsoft to use that data in certain ways. *See* Ex. 6 § 1. The Privacy Statement will be central to the Arbitration Plaintiffs' claims that they never consented to Microsoft "intercepting" their data or to OpenAI "intercepting" data they provided to Microsoft on its services. *See, e.g.*, FAC ¶¶ 548–566 (alleging interception claims, including based on alleged lack of consent). The dispute over the scope of the Arbitration Plaintiffs' consent to the collection and use of their data is thus a dispute over "these Terms" under the arbitration agreement and so Plaintiffs must pursue it in individual arbitration.[10]

The Arbitration Plaintiffs' claims are comfortably within the MSA's "broad" arbitration agreement. *See, e.g.*, *Amirhamzeh v. Wells Fargo Bank, N.A.*, 2014 WL 12610227, at *1 (N.D. Cal Oct. 31, 2014) (Chhabria, J.) (enforcing "extremely broad" arbitration agreement that covered "any disputes"); *Diaz v. Intuit, Inc.*, 2017 WL 4355075, at *3 (N.D. Cal. Sept. 29, 2017) (compelling arbitration of claims

---

[9] The Arbitration Plaintiffs allege using several other Microsoft services covered by the MSA, such as Microsoft Outlook and Microsoft Word, but do not explain how those services relate to their claims. *See* FAC ¶¶ 35 (Guilak), 46 (Martin), 77 (Paz). To the extent Plaintiffs claim harm based on their use of those services, those claims would also be covered by the broad arbitration agreement of the MSA.

[10] The arbitration agreement contains a narrow exception for "disputes relating to the enforcement or validity of your, your licensors', our, or our licensors' intellectual property rights." Ex. 6 § 15(a). The Arbitration Plaintiffs do not bring such intellectual property claims here.

where "broad" arbitration agreement required arbitration of "any dispute or claim relating in any way to the services or this agreement").[11]

### C. The Court Should Stay the Arbitration Plaintiffs' Claims Pending Arbitration.

The FAA requires staying proceedings after granting a motion to compel arbitration on the application of a party. *See* 9 U.S.C. § 3. The Court should stay the Arbitration Plaintiffs' claims pending the outcome of arbitration.

### V. CONCLUSION

Microsoft respectfully requests that the Court compel the Arbitration Plaintiffs to arbitrate their claims against Microsoft on an individual basis and stay the case pending resolution of that arbitration.

DATED: February 8, 2024

Respectfully submitted,

By: */s/ Isaac D. Chaput*

Emily Johnson Henn (Bar No. 269482)
Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306

---

[11] To the extent the Arbitration Plaintiffs argue that Microsoft's arbitration agreement is unconscionable, they will be unable to meet their burden. Under California law, the party seeking to avoid a contract must show *both* procedural and substantive unconscionability. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). The Arbitration Plaintiffs cannot show procedural unconscionability because the Arbitration Agreement was easy to find and in plain language. *See In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 953 (N.D. Cal. 2021) (no procedural unconscionability even though there was no opportunity to negotiate and terms were available in hyperlinked text instead of automatically displayed). And they cannot show substantive unconscionability because the MSA allows them to: (1) arbitrate for free, since Microsoft reimburses the filing fee and pays the arbitrator's fees and expenses for claims of $75,000 or less; (2) obtain the same individual relief as in court; (3) for claims of $75,000 or less, recover reasonable attorney's fees and expenses if they obtain an award that exceeds Microsoft's last written settlement offer made before the arbitrator was appointed; (4) initiate their arbitrations by submitting a form to the AAA available via a hyperlink in the MSA; and (5) pursue their arbitrations in-person in their counties of residence. Ex. 6 § 15. The MSA thus contains precisely the sort of convenient, fair, and efficient arbitration procedures that courts routinely find are not substantively unconscionable. *See, e.g.*, *Hovis v. Homeaglow, Inc.*, 2023 WL 5003583, at *4 (S.D. Cal. Aug. 4, 2023) (no substantive unconscionability where the agreement called for neutral arbitrator, provided for "adequate discovery," ensured a written award, did not limit remedies, and called for the defendant to pay filing fees and the arbitrator's fees).

Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800
Email: ehenn@cov.com
Email: kcahoy@cov.com

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Isaac D. Chaput (Bar No. 326923)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: ichaput@cov.com

*Attorneys for Defendant Microsoft Corporation*